# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 22, 2015

## STATE OF TENNESSEE v. JOSHUA L. CARTER AND ADONIS LASHAWN MCLEMORE

### Appeal from the Criminal Court for Davidson County
### Nos. 2011-B-1648 & 2011-D-3013     Mark J. Fishburn, Judge

---

### No. M2014-00767-CCA-R3-CD – Filed June 26, 2015

---

Appellant Joshua L. Carter was convicted in case 2011-B-1648 of the sale of less than .5 grams of cocaine in a drug-free zone, a Class B felony; possession with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone, a Class A felony; simple possession of marijuana, a Class A misdemeanor; and evading arrest, a Class A misdemeanor.  As a Range II, multiple offender, his effective sentence in case 2011-B-1648 was forty years.  Appellant Carter was convicted in case 2011-D-3013 of felony murder; attempted especially aggravated robbery, a Class B felony; and voluntary manslaughter, a Class C felony that the trial court merged with the felony murder conviction.  For these offenses, appellant Carter received an effective life sentence, consecutive to his effective forty-year sentence in case 2011-B-1648.  Appellant McLemore was convicted in case 2011-D-3013 of facilitation of especially aggravated robbery, a Class B felony, and facilitation of felony murder, a Class A felony.  Appellant McLemore, as a Range III, persistent offender, received an effective sentence of fifty years.  On appeal, appellant Carter argues that evidence was insufficient to support his convictions in both cases and that in case 2011-D-3013, the trial court erred under Tennessee Rule of Evidence 609 by allowing the State to impeach him with a prior conviction for selling drugs.  Appellant McLemore argues that the evidence was insufficient to support his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. JOHN EVERETT WILLIAMS, J., filed a separate, concurring opinion.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Joshua L. Carter.

Kyle Fite Mothershead (on appeal); and Jay Norman (at trial), Nashville, Tennessee, for the appellant Adonis LaShawn McLemore.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Victor S. Johnson III, District Attorney General; and Sarah N. Davis and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This appeal involves two separate cases, 2011-B-1648 ("1648") and 2011-D-3013 ("3013"), with appellant Joshua L. Carter as the defendant.[1]  Appellant Adonis LaShawn McLemore was appellant Carter's co-defendant in Case 3013, and his appeal was consolidated by order of this court with appellant Carter's appeal.  Case 1648 stemmed from an undercover operation by the Metro Nashville Police Department investigating drug trafficking in Nashville that resulted in the Davidson County grand jury's indicting appellant Carter for selling less than .5 grams of cocaine in a drug-free zone; possession with intent to sell or deliver more than .5 grams of cocaine in a drug-free zone; simple possession of marijuana; possession of drug paraphernalia; and evading arrest.  Case 3013 stemmed from an encounter between appellants Carter and McLemore and murder victim Jordan Gardner across the street from the Out of Bounds nightclub in Nashville that resulted in the grand jury's indicting appellant Carter for premeditated murder and both appellant Carter and appellant McLemore for especially aggravated robbery and felony murder.

---

[1]  There is no order in the record consolidating appellant Carter's two cases for appeal; thus, we conclude that consolidation was inadvertent.

-2-

## I. Facts Related to Case 1648

Metro Nashville Police Detective Jeremy Smith testified that on March 4, 2011, he was the undercover officer in a "buy-bust" narcotics operation. He explained that a "buy-bust" operation involves an undercover officer who purchases drugs, a "close-cover" team that surveils the situation for the officer's safety, and a "take-down" team that arrests the drug dealer after the purchase. The undercover officer would wear a listening device that transmitted audio to other members of the team but did not record audio. Detective Smith testified that for the March 4, 2011 operation, he was posing as a drug user. He approached Purvis Edwards in a tobacco store parking lot to ask for a lighter. Mr. Edwards entered Detective Smith's car, and Detective Smith asked Mr. Edwards whether he had a "twenty" or could get him a "twenty." Detective Smith explained that a "twenty" was $20 worth of crack cocaine. Mr. Edwards responded that he could take the detective to get the drugs but wanted to go to a Money Gram store first. Prior to going to the Money Gram store, Mr. Edwards called someone and told that person that he wanted two "twenties."

Detective Smith testified that he took Mr. Edwards to the Money Gram store, and when Mr. Edwards returned to Detective Smith's car, he made another telephone call, this time saying that he was on his way. Mr. Edwards directed Detective Smith to the Cee Bee Food Store on Lafayette Street and Charles E. Davis Boulevard. Detective

-3-

Smith parked and gave Mr. Edwards two $5 bills and one $10 bill, all of which had been previously photocopied. Mr. Edwards walked towards the store and out of Detective Smith's sight. When Mr. Edwards returned to the car, he gave back to Detective Smith the $20, saying that he could not make the drug purchase "because the vice was out." Detective Smith explained that meant someone in the area had seen police officers. Mr. Edwards made another telephone call, again asking for two "twenties," as Detective Smith was driving away from Cee Bee Food Store. Mr. Edwards directed Detective Smith to return to the food store. Mr. Edwards took the previously-photocopied money from Detective Smith and walked to the front corner of the store. Detective Smith testified that Mr. Edwards met a black male wearing a black, long-sleeved shirt and a "gray puffy-like . . . jacket with no sleeves." Detective Smith said that an obstruction prevented him from seeing their hands. The two men were together for approximately thirty seconds, and then Mr. Edwards returned to Detective Smith's car. Mr. Edwards showed Detective Smith several loose white rocks in his hand, which he then gave to the detective. Detective Smith testified that having a small amount of drugs loose and held in a hand rather than in a bag was typical because drug dealers would break off a piece of a larger rock of crack cocaine to give it to the buyer. When he had the drugs in his hand, Detective Smith gave a signal to other officers to begin the "take-down." He said that appellant Carter ran towards the J.C. Napier housing project, where he was taken into custody.

-4-

Detective Smith testified that in connection with the buy-bust operation, the police collected a large rock of cocaine, several small rocks of cocaine, and marijuana separated into small bags. Detective Smith further testified that the police collected $215 in currency from appellant Carter, including the two $5 bills and the one $10 bill that Detective Smith had previously photographed and had given to Mr. Edwards.[2]

On cross-examination, Detective Smith said that he did not remember testifying in a January 2012 proceeding that he saw appellant Carter place something in Mr. Edwards' hand. He stated that the January statement was "true and correct" because it was closer to the date of the operation. Detective Smith agreed that he did not give a description of appellant Carter to other officers and explained that other officers watching the scene would have given that description. Detective Smith testified that he did not see appellant Carter throw anything on the ground before his arrest and did not see his arrest. He said that one would not find drugs just lying on the ground in that general area. Detective Smith could not remember whether Mr. Edwards, after being arrested, asked where the person was who had sold him the drugs.

On re-direct examination, Detective Smith clarified that he saw hand movements between appellant Carter and Mr. Edwards but that he did not see the actual items being exchanged. Detective Smith testified that he was familiar with the area where the buy-

---

[2] Because chain of custody is not an issue on appeal, we have omitted all testimony relating to chain of custody.

bust operation had occurred and had conducted routine walking patrols around the J.C. Napier housing project. He had never seen drugs lying on the ground.

David Kline testified that he managed the mapping division at the Metro Nashville Planning Department and that as part of his duties he created 1,000 feet drug-free zones around certain properties. For purposes of appellant Carter's trial, he had created a map showing Cameron Middle School, the drug-free zone around the school, and Cee Bee Food Store. He testified that he was familiar with Cameron Middle School on a personal level because he tutored there twice weekly, including the time that the buy-bust operation occurred; therefore, he knew that the middle school was "an opening and functioning" public school.

Tennessee Bureau of Investigation ("TBI") Special Agent forensic scientist Cassandra Ann Franklin-Beavers testified that she weighed and tested the substances given to her in relation to this case. Two substances were cocaine base, also known as crack cocaine, one of which weighed 2.52 grams and the other 0.3 grams. The third substance was marijuana. While Agent Franklin-Beavers did not testify about the weight of the marijuana, her laboratory report, entered as an exhibit to the trial, indicated that the marijuana weighed 4.5 grams.

Purvis Lee Edwards, an indicted co-defendant in this case, testified that he had numerous prior convictions, including four misdemeanor theft convictions, two felony forgery convictions, two misdemeanor fraudulent use of a credit card convictions, and three possession of less than .5 grams of cocaine convictions. He said that the drug and theft convictions were related to his drug use. Mr. Edwards testified that in March 2011, he had been living in a hotel after being released from incarceration. On the day in question, his brother had sent him a Money Gram to help him pay for rent, but Mr. Edwards did not have a way to get to the Money Gram store to retrieve the money. He was walking to a nearby store when a white man in a vehicle, Detective Smith, stopped him to ask if he knew where to get "D," which Mr. Edwards explained meant "dope." Mr. Edwards responded affirmatively and asked for a ride to the Money Gram store. Detective Smith drove him to the Money Gram store and then back to Cee Bee Food Store. Mr. Edwards testified that he wanted to simply pay Detective Smith for the ride and leave but that the man reminded him about getting drugs. Mr. Edwards said that he walked around the block, returned to Detective Smith, and told him that there were no drugs because "vice was out." Mr. Edwards stated that he had not made a real effort to find any drugs at that point but that he reconsidered when Detective Smith pointed out that he would have already gotten the drugs he wanted if he had not taken Mr. Edwards to the Money Gram store. Mr. Edwards testified that he then made a concerted effort to find drugs, so he called several people, including appellant Carter. When he asked appellant Carter if he was in the area, appellant Carter responded that he was "right here." Mr.

Edwards testified that he met appellant Carter in front of the check cashing store directly next to Cee Bee Food Store and that they walked together to the front of Cee Bee Food Store. Mr. Edwards said that he asked appellant Carter for two "dimes," or two $10 pieces of crack cocaine. Mr. Edwards testified that he and appellant Carter exchanged money for the drugs and that he returned to Detective Smith's vehicle. He gave Detective Smith all of the cocaine and was subsequently arrested. Mr. Edwards testified that the Thursday before appellant Carter's trial began, the two men were in a holding cell awaiting a court date when appellant Carter told Mr. Edwards that he wanted him to give appellant Carter's attorney a version of events with which Mr. Edwards disagreed. Mr. Edwards said that appellant Carter wrote down that he wanted Mr. Edwards to say that he had given appellant Carter the "marked" money in exchange for a $20 bill and that Detective Smith had been parked on the side of the building where he could not have seen their transaction. Mr. Edwards said that he recalled Detective Smith being parked directly behind the men.

On cross-examination, Mr. Edwards testified that appellant Carter had written down the information for him; however, Mr. Edwards tore up the paper and flushed it down a toilet. He said that he had a change of heart and did not want to start a new life with a lie. Mr. Edwards agreed that he gave appellant Carter money and that appellant Carter gave him drugs. Mr. Edwards also confirmed that when both men were arrested, he asked the police officers where the man was who had sold him the drugs and said that

appellant Carter was not the man. Mr. Edwards stated that he was lying when he said that to the police and that he "was actually laying a foundation for Mr. Carter to build upon later because he was [Mr. Edwards'] drug dealer at that time."

Metro Nashville Police Detective Marcel Chalou testified that on March 4, 2011, he was providing "close cover" for Detective Smith in the buy-bust operation, meaning that he was in an unmarked car close to Detective Smith. Detective Chalou said that he was parked in the Cee Bee Food Store parking lot and watched Mr. Edwards approach appellant Carter. He testified that he saw a "hand-to-hand transaction" and described exactly what he observed: "I see Mr. Edwards, his hands go as if he's passing something to Mr. Carter, then I see them, they're looking down, I see Mr. Edwards' hand is out flat and Mr. Carter, what I viewed is him placing something in Mr. Edwards' hands." Detective Chalou said that he relayed appellant Carter's description to the rest of the team — "short male black, blue jeans, black shirt, gray puffy vest." After both appellant Carter and Mr. Edwards were taken into custody, Detective Chalou looked at both of their telephones and saw that Mr. Edwards had called appellant Carter.

On cross-examination, Detective Chalou testified that he followed appellant Carter across Lafayette Street into the J.C. Napier housing project but that he turned right instead of following directly behind appellant Carter in an attempt to intercept him. Detective Chalou said that he did not see appellant Carter discard anything. Detective

Chalou further said that he had seen drugs on the ground in that neighborhood but that there was "[g]enerally . . . a reason why." He stated that he had never "just randomly come up, been walking down the street and found [a] bag of drugs." Detective Chalou could not recall citizens being in the immediate area of appellant Carter's arrest but believed that some people were around the buildings nearby.

Metro Nashville Police Detective Steven Jenkins testified that he was on the "take-down" team involved in the March 4, 2011 buy-bust operation that resulted in appellant Carter's arrest. He said that in his experience, he had learned that oftentimes suspects would try to hide from police in the housing projects. On March 4, he tried to position himself and his partner, Detective Robert Young, for the likelihood of a foot pursuit. He recalled hearing Detective Chalou's description of appellant Carter over the radio. After receiving the description, Detective Young exited their vehicle in an attempt to cut off appellant Carter. Detective Jenkins said that he parked the car and followed Detective Young. He saw appellant Carter running down a hill. Detective Young first encountered appellant Carter, and appellant Carter attempted to reverse course. Detective Jenkins chased after him, and he saw appellant Carter throw a baggy. The baggy hit a brick wall and fell to the ground. Detective Jenkins said that he was only three to four feet away from appellant Carter at that point and then took him into custody. Detective Young recovered the bag soon thereafter. Detective Jenkins testified that after he was arrested, appellant Carter made a statement that he knew he should not have been selling because

he had seen "the white girl," which Detective Jenkins interpreted to mean Detective Dills, a female detective on the take-down team that day.

Detective Young corroborated Detective Jenkins' testimony. He added that the bag discarded by appellant Carter contained crack cocaine and marijuana. Detective Young searched appellant Carter and found over $200 in currency. Detective Young said that he was carrying a photocopy of the buy money used in the operation and was able to confirm on the scene that appellant Carter's currency included the bills used as buy money. On cross-examination, Detective Young stated that he believed he and Detective Jenkins exited the car at the same time. He was not sure whether appellant Carter had retrieved the bag from a pocket or whether it had been in his hand.

After Detective Young's testimony, the State rested its case-in-chief. Thereafter, appellant Carter moved for a judgment of acquittal on all counts. The trial court granted the judgment of acquittal for the drug paraphernalia count after the State conceded it had not presented proof to support that charge. The trial court otherwise denied appellant Carter's motion. Appellant Carter did not put on any proof. Subsequently, the jury convicted appellant Carter of the sale of less than .5 grams of cocaine in a drug-free zone, a Class B felony; possession with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone, a Class A felony; simple possession of marijuana, a Class A misdemeanor; and evading arrest, a Class A misdemeanor. The trial court found that

appellant Carter was a Range II, multiple offender. It sentenced him to concurrent terms of forty years (twenty-year mandatory minimum to serve) for the Class A felony; twenty years (twelve-year mandatory minimum to serve) for the Class B felony; and eleven months, twenty-nine days for each Class A misdemeanor.

## II. Analysis — Case 1648

Appellant Carter contends that the evidence was insufficient to support his convictions in case 1648. Specifically, he argues that the jury should have disregarded all impeached testimony and claims that the testimony of appellant Carter's accomplice was uncorroborated. The State responds that it met its burden of proving each element of the offenses beyond a reasonable doubt. We agree with the State.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at

319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing

*State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant Carter was convicted of selling less than .5 grams of cocaine in a drug-free zone; possessing with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone; simple possession of marijuana; and evading arrest. In order to support his convictions, the State had to prove that appellant Carter sold cocaine in an amount less than .5 grams within 1,000 feet of a school, *see* Tennessee Code Annotated sections 39-17-417(a)(3), -417(b)(2), -432(b)(1); that he possessed with the intent to sell or deliver more than .5 grams of cocaine within 1,000 feet of a school, *see* Tennessee Code Annotated sections 39-17-417(a)(4), -417(b)(1), -432(b)(1); that he knowingly possessed a controlled substance, *see* Tennessee Code Annotated section 39-17-418(a); and that he intentionally fled from a person he knew to be a law enforcement officer when he knew the law enforcement officer was attempting to arrest him, *see* Tennessee Code Annotated section 39-16-603(a)(1)(A).

Viewed in the light most favorable to the State, the evidence presented at appellant Carter's trial showed that Purvis Edwards called him to purchase cocaine; that he met Mr. Edwards in front of a store; that he gave Mr. Edwards .3 grams of cocaine in exchange for twenty dollars; that the exchange took place within 1,000 feet of a school; that he ran away from the police when they attempted to arrest him; that he had the previously photocopied money from Detective Smith on his person; and that he threw down, in the

presence of two officers, a bag containing 4.5 grams of marijuana and 2.52 grams of cocaine. On appeal, appellant Carter contends that due to discrepancies in Detective Smith's testimony at trial and testimony at a prior proceeding, the jury should have dismissed Detective Smith's testimony entirely. Likewise, he claims that the jury should have disregarded Mr. Edwards' testimony because of his prior convictions. In both situations, the issue is a matter of credibility, which is in the purview of the jury. *Bland*, 958 S.W.2d at 659. As such, we will not re-visit the issue. *Dorantes*, 331 S.W.3d at 379. Appellant also argues that Mr. Edwards' testimony was not corroborated; however, the only portion of Mr. Edwards' testimony about which he complains was Mr. Edwards' assertion that appellant Carter attempted to influence Mr. Edwards' testimony prior to trial. While it is true that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense," *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001), appellant Carter was not tried for any offense relating to this portion of Mr. Edwards' testimony. The portions of Mr. Edwards' testimony that related directly to appellant were corroborated by two police officers who were eyewitnesses to the transaction. Taking all of this evidence and appellant's arguments into consideration, we conclude that the State presented sufficient evidence to convict appellant Carter of the sale of less than .5 grams of cocaine in a drug-free zone; possession with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone; simple possession of marijuana; and evading arrest.

III. Facts Related to Case 3013

Metro Nashville Police Officer Zachary Grunow testified that on May 6, 2011, he responded to a shooting on Murfreesboro Road, specifically in a parking lot of a law firm that was across the street from the Out of Bounds Sports Bar. Officer Grunow said that the victim was already deceased when he arrived and that the victim was lying between two vehicles, a green Honda and a white Pontiac. Officer Grunow stated that the officers on the scene were securing the scene and interviewing witnesses. For his part, he conducted a preliminary interview of Jay Artis.

On cross-examination, Officer Grunow testified that he arrived at the scene between 2:00 and 3:00 a.m. He said that the parking lot was lit by street lights but did not know whether the police had provided additional lighting by the time a photograph of the scene was taken. Officer Grunow testified that Mr. Artis gave him a description of the suspects and that his report reflected that the description of one suspect was "a male black approximately 5′7, wearing a white T-shirt with writing on it." The second suspect was described as "a male black approximately 5′9[,] wearing a plain black T-shirt and a light blue hat."

Jay Artis testified that on May 5, 2011, he and the victim, Jordan Gardner, whom he had known for approximately one year, went to Out of Bounds. Before they went to

the club, they each obtained a one hundred dollar bill that they wrapped around several one dollar bills, to make it seem as if they had more money than they did. At the club, they sat in a booth with two women. While he could not remember the name of either, it is clear from other testimony that one of the women was Pamela Jenkins, an indicted co-defendant in this case. Mr. Artis recalled that he and the victim stayed together all night but that Ms. Jenkins came and went. He remembered that she made several telephone calls, but he said that he never heard her telephone conversations. Mr. Artis testified that he and the victim flashed their rolls of money at times. At closing time, the victim left the club with Ms. Jenkins, and Mr. Artis followed them. Mr. Artis said that the victim told him there was a woman outside for Mr. Artis to meet. Ms. Jenkins told Mr. Artis that the woman was her sister, and other testimony reveals that the woman was Jessica Rucker. Mr. Artis entered Ms. Rucker's car, and she drove across the street to the lot where Mr. Artis and the victim had parked. Ms. Jenkins and the victim walked to the lot. Mr. Artis testified that the victim and Ms. Jenkins were talking outside of Ms. Rucker's car, and he was talking to Ms. Rucker inside her car. He said that he then saw the victim struggling with a man. The victim and the man moved to the back of the car during their struggle, and Mr. Artis opened the door to get out and help the victim. He testified that the victim managed to push the man away but that the man drew a gun and shot the victim twice. Mr. Artis described the shooter as short and as having facial hair. At that point, Mr. Artis said that he saw a second man behind the shooter wearing a light blue cap. Mr. Artis said that later, the police showed him several sets of photographs. He

-17-

identified both the shooter and the second man in those photographs.  For the shooter, Mr. Artis said that he was one hundred percent sure of his identification in the photograph array, and he also identified appellant Carter from the witness stand as the shooter.  For the second man, Mr. Artis said that he was eighty percent sure of his identification in the photograph array, and Mr. Artis identified appellant McLemore in the courtroom as the second man involved in the shooting.  Mr. Artis identified the photograph array that the police showed to him and on which he had circled the fifth photograph.  He had also written on the array, "Number 5 is the shooter 100%."  Mr. Artis also identified a second photograph array on which he had circled the first photograph and written, "I feel 80% sure he was behind the shooter."

On cross-examination, Mr. Artis testified that the second person never said anything.  He agreed that it was possible the second person was not involved.  He said that both the shooter and the second person ran behind a building after the victim was shot.  Mr. Artis testified that the second person was 5′10″ or 5′11″.  He said that the shooter's facial hair was a thin beard.

Metro Nashville Police Detective Johnny Ray Crumby, Jr., testified that he responded to the scene of the shooting on May 6, 2011.  While at the scene, he was notified that the police had stopped a black male in a white vehicle because a security guard had reported seeing a white vehicle leaving the area of the shooting at a rapid

speed. Detective Crumby talked to the driver of the white vehicle who reported that he had driven away so quickly because he heard the shooting and was scared. Detective Crumby also had Mr. Artis view the driver to determine whether he was involved, and Mr. Artis said that he was not. Detective Crumby testified that he assisted Detective Andrew Injaychock in interviewing Mr. Artis at the police station. Mr. Artis reported to them that the shooter was 5′6″ or 5′7″ and that the second man was 5′10″ or 5′11″. Detective Crumby testified that during the investigation, he obtained appellant Carter's cellular telephone records and looked at the numbers he called around the time of the shooting. He also received a lead that a man named Shawn was involved, so he began dialing numbers listed in appellant Carter's records to determine whether any of those numbers belonged to Shawn. When he successfully connected to appellant McLemore, he arranged to meet with him. He confirmed that the number listed in appellant Carter's telephone belonged to appellant McLemore.

Jessica Rucker testified that Pamela Jenkins was her cousin. In May 2011, Ms. Jenkins and her children lived with Ms. Rucker. Ms. Rucker recalled that she had been concerned at the time that Ms. Jenkins was abusing prescription pain medication. Ms. Rucker testified that on May 5, 2011, she dropped Ms. Jenkins off at a store so that Ms. Jenkins could go to a club with a friend. She then picked up Ms. Jenkins' child from her mother's house and gave a ride to a friend called "Boo-Master" and his girlfriend. Ms. Rucker said that Ms. Jenkins called her from the club and told her about a man there with

a lot of money.  Ms. Rucker said that the man was the victim.  Ms. Jenkins asked Ms. Rucker to call Boo-Master about coming to the club.  Ms. Rucker testified that she interpreted the conversation to mean that Ms. Jenkins wanted Boo-Master to come to the club to rob the man.  Ms. Rucker stated that she was unable to contact Boo-Master.  She said that Ms. Jenkins called her again close to the club's closing time so that Ms. Rucker could pick her up.  Ms. Rucker testified that she was driving Ms. Jenkins' white Pontiac Grand Prix.  Ms. Rucker went to the club, and Ms. Jenkins exited the club with two men, one of whom was the victim.  Ms. Jenkins said that she did not know their names.  One man got into the car with her while the other one walked across the street with Ms. Jenkins.  Ms. Rucker said that she drove over to the lot across the street because that was where she was told to park.  She stated that she had no intention of "hanging out" with the two men, but one of them kept asking whether she was hungry, as in whether she wanted to eat somewhere.  Ms. Rucker said that the "robbery thing" happened then.  She testified that she saw a man in all black fighting with the victim, who was fighting back.  She said that she exited the car, heard gunshots, and ran to a nearby restaurant.  Ms. Rucker recalled that the man wearing all black said, "'Don't you owe me something,'" when he walked up to the car.

Ms. Rucker testified that while she ran across the street, Ms. Jenkins remained by the building at which they had parked.  She recalled Ms. Jenkins screaming during the attack but stated that afterwards, Ms. Jenkins "really didn't want to talk about it . . . it's

like it wasn't affecting her like it was affecting me." Eventually, a friend took Ms. Jenkins and Ms. Rucker home. Later, the police came to their home and took Ms. Jenkins to the police station. A couple of days later, she was stopped by the police on the interstate highway. Ms. Jenkins and Ms. Rucker's sister were also in the vehicle. They all went to the police precinct to speak with the police. She testified that she told the police the same thing she had told the jury.

On cross-examination, Ms. Rucker testified that she did not know Boo-Master's real name and that she had known him for several years. At the time of the shooting, Boo-Master was not working. Ms. Rucker said that Ms. Jenkins asked her to call Boo-Master and asked her to tell Boo-Master to call Ms. Jenkins. She said that she did not see the person who shot the victim exit a car and did not see where he went afterwards. Ms. Rucker denied ever telling Ms. Jenkins not to talk to the police.

Metro Nashville Police Officer Rhonda Evans testified that she was an officer with the identification section and that she helped process the crime scene connected to this case. Officer Evans stated that she photographed the scene using both the flash on her camera and "natural light." She explained that the flash allowed her camera to record the necessary details of the scene but that the natural light captured the lighting as it actually appeared without assistance of the flash. The natural light photographs were admitted into evidence as collective exhibit seven, and the flash photographs were admitted into

evidence as collective exhibit eight. Officer Evans and another crime scene technician processed various items collected around the crime scene, the two vehicles that were next to the victim's body, and an area of Out of Bounds for fingerprints. She explained that she processed the area at Out of Bounds because the police had information that parties involved in the shooting had been at the club. Officer Evans testified that a projectile was found and collected at the scene. Metro Nashville Police Officer Sharon Tilley, also with the identification section, corroborated Officer Evans' testimony. In addition, Officer Tilley photographed the victim's body during the autopsy and photographed the contents of the victim's pockets. The victim had ten one-dollar bills but no one-hundred dollar bills.

Pamela Jenkins testified that she had been indicted in the instant case. She said that she had not received any kind of deal in exchange for her testimony. Ms. Jenkins testified that she went to Out of Bounds with a friend named Chris on May 5, 2011. She met Jay Artis and the victim[3] on the dance floor and then sat with them in a booth until closing time. She recalled that they were both throwing money around while on the dance floor and that she warned them about getting robbed. She said that the men had a verbal argument with someone in the club but that they "squashed" the argument by apologizing. Ms. Jenkins testified that appellant Carter was also in the club that evening, wearing an orange shirt. Ms. Jenkins authenticated several photographs taken inside Out

---

[3] She referred to Jay Artis as "Big J" and the victim as "Little J."

of Bounds that night by a promotion company. In the photographs, she identified herself, sitting in a booth, and appellant Carter, standing in the background of the photographs. In the photographs, appellant Carter was wearing a short-sleeved, orange shirt over a long-sleeved, light-colored shirt.

Ms. Jenkins further testified that she called her cousin Jessica Rucker and asked her to contact Boo-Master. She explained that she wanted Boo-Master to come to the club to rob Mr. Artis and the victim. However, she never spoke with Boo-Master that night nor did she see him. She said that the next time she talked to Ms. Rucker, she asked Ms. Rucker to pick her up at the club. Ms. Jenkins testified that she was not expecting Boo-Master to accompany Ms. Rucker because she had already talked to appellant Carter about robbing the victim and Mr. Artis. She stated that she told appellant Carter that the two men had a lot of money. He said that he would rob them and instructed her to get the men outside of the club. Ms. Jenkins testified that she left the club with the two men and that Mr. Artis got into the car with Ms. Rucker. Ms. Rucker drove across the street, and Ms. Jenkins walked across the street with the victim to where his car was parked. She said that she and the victim were talking to Ms. Rucker when appellants Carter and McLemore "came out of nowhere." She testified, "[Appellant Carter] had a gun on [the victim], and [appellant McLemore] was wrestling with [Mr. Artis], and next thing I know they got to scuffling over the gun[,] and the gun went off three times[,] and we took off." Ms. Jenkins recalled hearing appellant Carter say, "'[G]ive me what you owe me.'" She

said that the appellants got into a black car after the shooting.

Ms. Jenkins testified that immediately after the shooting, she called appellant Carter, but he did not answer his telephone. The next time she talked to him, he asked her to meet him "out south," which she clarified as meaning a specific housing project. He told her that he did not want to talk over the telephone. Ms. Jenkins said that she spoke with the police that day, May 6, but did not tell them who had robbed the victim. She stated that she did not tell the truth because she was scared of the appellants. The next day, she met appellant Carter. Upon her request, he had a person drive her to her car. Ms. Jenkins said that appellant Carter instructed the person "to bring [Ms. Jenkins] back to him." When she got her car, she returned to appellant Carter's location at a housing project. Appellant McLemore was also present. Ms. Jenkins said that she asked appellant Carter why he had shot the victim. He did not answer her. She also asked whether he had gotten any money from the victim, and he told her he did not. Ms. Jenkins testified that appellant Carter told her not to talk to anyone and threatened to shoot up her mother's house. However, the police stopped her on the interstate sometime later and took her in to the precinct. She said that she told the police then that appellants Carter and McLemore were responsible for the robbery. Ms. Jenkins admitted that she had misdemeanor convictions for shoplifting and attempted false report.

On cross-examination, Ms. Jenkins testified that she told the police that the person

with whom the victim and Mr. Artis argued in the club was wearing a white shirt and blue hat. She denied that the person with whom they argued was Boo-Master. She said she had grown up with Boo-Master, and she agreed that he robbed people. Ms. Jenkins said that she only tried to call Boo-Master once that evening and that Ms. Rucker placed the call using the three-way function on her telephone. Ms. Jenkins testified that appellant Carter was her height — 5′3″. She said that when he shot the victim, he was wearing the same thing he had been wearing in the club, and she affirmed that he had been wearing an orange shirt. Ms. Jenkins denied telling the police that the robbers exited a black Monte Carlo. She said that when she was standing across the street after the shooting, she saw them leave the area in a black Monte Carlo. Ms. Jenkins confirmed that she saw appellant McLemore "scuffling" with Mr. Artis. She also confirmed that Ms. Rucker told her not to talk to anyone about the event. Ms. Jenkins did not remember giving an interview to an officer at the crime scene after the shooting. She agreed that in her initial interview with detectives, she told them that she did not know either man involved in the shooting and could not describe them. She recalled telling the police that the victim had said he had a "Chopper" in the trunk of his car. She did not remember telling the police that the victim had grabbed her throat and threatened her. Ms. Jenkins agreed that appellant Carter had not yet threatened her when she gave her initial interview. Ms. Jenkins agreed that appellant Carter did not have any facial hair. She confirmed that she heard three shots that night.

On re-direct examination, Ms. Jenkins testified that she had been drinking alcohol at the club and had taken one or two Xanax "bars."

Dr. Bridgette Eutenier testified that the victim had a gunshot entry wound on the left side of his neck and that the corresponding exit wound was on the right side of his head. The projectile damaged his esophagus, a vertebral artery, the cervical vertebrae, and the base of his skull. It also caused a subarachnoidal hemorrhage. She testified that the victim would have lived for a few minutes without medical intervention, and she agreed that it was possible that he would have dropped to the ground immediately after being shot.

TBI Special Agent Richard Wesley Littlehale testified as an expert in the use of telecommunication records in criminal investigations. Regarding cellular telephone location information, Agent Littlehale testified that historical cellular telephone records indicated which cellular tower a particular telephone used at any given point. He said that a telephone will generally use the closest cellular tower that has open channels. A telephone will use towers that are farther away if the closest tower is "full," is having technical problems, or is blocked by an obstruction.

Metro Nashville Police Sergeant Andrew Injaychock testified that he was a homicide detective at the time of the May 6, 2011 shooting of the victim and that he was

the lead investigator for the case. He responded to the scene within a short time of the shooting. Sergeant Injaychock described the area as being neither dimly lit nor well-lit. He testified that one of the first things the investigators did was to interview the driver of a white vehicle that had been seen leaving the area of the shooting, Joshua Martin. Sergeant Injaychock said that Mr. Artis, in a "show-up" identification, stated that Mr. Martin did not participate in the robbery/shooting.

Sergeant Injaychock testified that he had Detective Ball locate and interview Pamela Jenkins, explaining that Ms. Jenkins had left the crime scene. Sergeant Injaychock said that he obtained surveillance video from inside Out of Bounds but that the quality of the video was poor and did not show the club exits. There was no surveillance video outside the club, and the law firm next to which the shooting occurred did not have a functioning surveillance camera. Sergeant Injaychock also obtained still photographs taken inside the club. After completing their survey of the crime scene, Sergeant Injaychock and Detective Crumby interviewed Mr. Artis at the police precinct.

Sergeant Injaychock said that he focused more on Ms. Jenkins after interviewing Mr. Artis because she had not been honest in her interview with Detective Ball. Sergeant Injaychock interviewed Ms. Jenkins again on the Sunday following the shooting. Ms. Jenkins told him that she had been with the victim and Mr. Artis in the club and that they had been "flashing" money. She tried to call someone about robbing the victim and Mr.

Artis. When she was unsuccessful, she talked to appellant Carter, whom she said she had known since elementary school. Ms. Jenkins also told Sergeant Injaychock that "Boxhead Shawn" and appellant Carter were responsible for what happened in the parking lot. Thereafter, Sergeant Injaychock showed a photograph array to Mr. Artis, and he identified appellant Carter as the shooter. Sergeant Injaychock also showed Mr. Artis a photograph array that included the person Ms. Jenkins had originally tried to contact about the robbery, Cornell Bradley, also known as Boo-Master. Mr. Artis did not make an identification from that array.

Sergeant Injaychock testified that to identify "Boxhead Shawn," the police "cold-called" numbers listed in appellant Carter's telephone records until someone answered that he was "Shawn." The person agreed to an interview, and subsequently, the police learned that his real name was Adonis McLemore. Sergeant Injaychock testified that he asked appellant McLemore whether he went by the nickname "Boxhead Shawn," and appellant McLemore agreed that he did. He also said that few people knew that nickname. Sergeant Injaychock later showed Mr. Artis a photograph array that included appellant McLemore's photograph. Mr. Artis identified appellant McLemore as the second person involved but stated that he was only eighty percent sure. The police also showed Ms. Jenkins a photograph array including appellant McLemore's photograph, and she identified his photograph as "Boxhead Shawn." Sergeant Injaychock testified that he had obtained the cellular telephone records of Jessica Rucker, Pamela Jenkins, appellant

Carter, and appellant McLemore. After learning that appellant Carter called Joshua Martin, the man who had been driving the white car after the shooting, Sergeant Injaychock interviewed Mr. Martin again and also showed Mr. Artis a photograph array including Mr. Martin. Thereafter, he eliminated Mr. Martin as a suspect.

Sergeant Injaychock next testified about the information he gleaned from the cellular telephone records collected in this case. As a point of reference, he testified that the 9-1-1 call reporting the shooting occurred at 2:38:35 a.m. The records of Ms. Jenkins and Ms. Rucker reflect many calls back and forth in the early morning hours of May 6. Appellants Carter and McLemore had six telephone exchanges between 2:04 a.m. and 2:15 a.m. Sergeant Injaychock did not testify[4] about the cellular tower to which appellant Carter's telephone connected during those calls; however, he testified that appellant McLemore's telephone connected to Sprint Tower 1479, 3.79 miles from the crime scene, at 2:04 a.m. From 2:05 a.m. until 2:10 a.m., appellant McLemore's telephone used Sprint Tower 1387, 3.29 miles from the crime scene. At 2:15 a.m., appellant McLemore's telephone used Sprint Tower 1389, 1.5 miles from the crime scene. Maps showing the locations of the towers were shown to the jury. Appellant McLemore did not use his telephone again until 2:46 a.m. Ms. Jenkins first called appellant Carter at 2:16 a.m. During that call, her cellular telephone used Cricket Tower 147, 0.17 miles

---

[4] Sergeant Injaychock utilized a PowerPoint presentation during his testimony. That presentation was not entered into evidence, and due to the highly technical nature of the telephone records that were introduced into evidence, we are limited to presenting Sergeant Injaychock's oral testimony.

from the crime scene.[5] Appellant Carter's telephone used Cricket Tower 51, 1.78 miles from the crime scene. Appellant Carter and Ms. Jenkins exchanged calls at 2:25 a.m., 2:32 a.m., and 2:33 a.m., and for all three calls, appellant Carter's and Ms. Jenkins' telephones were using Cricket Tower 147. At 2:38 a.m., appellant Carter called Ms. Jenkins. His telephone connected to Cricket Tower 51, 1.78 miles from the crime scene. At 2:48, he called Ms. Jenkins again, and this time his telephone connected to Cricket Tower 50, 3.25 miles from the crime scene.

Sergeant Injaychock testified that the records also reflected calls between Ms. Jenkins and appellant Carter and between appellant Carter and appellant McLemore later in the day on May 6. Also on May 6, appellant Carter called a number that he later called again from jail. The call from jail was recorded, and the recording was played for the jury. In it, appellant Carter discussed with an unidentified woman about how the woman had given a ride to Ms. Jenkins on May 6. He also suggested to the woman that she contact a private investigator already working on appellant Carter's case to say that Ms. Jenkins had told her how tall the shooter was, which both appellant Carter and the unidentified woman agreed was taller than appellant Carter's height. Sergeant Injaychock testified that according to his driver's license, appellant Carter was 5′5″.

---

[5]  This distance is listed in a document provided by Metropolitan Planning Department. The parties stipulated to its entry as evidence. However, Sergeant Injaychock testified that Tower 147 was 1.7 miles from Out of Bounds.

On cross-examination, Sergeant Injaychock agreed that cellular telephone records could only show the location of the tower that a telephone used, not the exact location of the telephone. He also agreed that people had been celebrating Cinco de Mayo on May 5 and that the bars in Nashville closed between 2:00 a.m. and 3:00 a.m. Sergeant Injaychock said that the victim did not have a wallet nor did he have the roll of money with which he had been seen earlier in the day. He agreed that it was possible that the victim had literally thrown away his money while on the dance floor in the club.

Following Sergeant Injaychock's testimony, the State closed its case-in-chief. Appellants Carter and McLemore did not present any proof. Subsequently, the jury convicted appellant Carter of the lesser-included offense of voluntary manslaughter, the lesser-included offense of attempted especially aggravated robbery, and felony murder. The trial court merged appellant Carter's voluntary manslaughter conviction into his felony murder conviction. The court sentenced appellant Carter as a Range II, multiple offender to twenty years for the attempted especially aggravated robbery conviction, concurrent with his life sentence for felony murder. The trial court ordered that his effective life sentence be served consecutively to his sentences in Case 1648.

Appellant McLemore was convicted of the lesser-included offense of facilitation of especially aggravated robbery and the lesser-included offense of facilitation of felony murder. The trial court sentenced appellant McLemore as a Range III, persistent offender

to thirty years for the facilitation of especially aggravated robbery conviction and to a concurrent sentence of fifty years for the facilitation of felony murder conviction.

Both appellants' motions for new trial were denied, and they now appeal their convictions to this court.

IV. Analysis — Case 3013

A. Appellant Carter — Rule 609

Appellant Carter contends that the trial court erred by ruling that the State would be allowed to impeach his credibility, should he have chosen to testify, with a prior conviction for the sale of drugs.[6] The State responds that the trial court did not abuse its discretion in allowing, for impeachment purposes only, evidence of appellant's prior conviction for the sale of drugs, especially because the trial court disallowed evidence of two other prior convictions for facilitation of aggravated robbery and facilitation of second degree murder.

We review a trial court's ruling on the admissibility of prior convictions for impeachment purposes for abuse of discretion. *State v. Lankford*, 298 S.W.3d 176, 180

---

[6] To clarify, appellant Carter's trial for the especially aggravated robbery and murder of Jordan Gardner was conducted separately from the drug case previously analyzed in this opinion.

(Tenn. Crim. App. 2008); *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). Rule 609 of the Tennessee Rules of Evidence governs the use of prior convictions for impeachment evidence. The rule states, in part:

> (a)(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

As applicable in this case, Rule 609 permits, under certain conditions, introduction of an accused's felony convictions that are less than ten years old for impeachment purposes. Tenn. R. Evid. 609(a)(2), (b). As our supreme court has stated, while Rule 609 "suggests that the commission of any felony is 'generally probative' of a criminal defendant's credibility," there is no "per se rule that permits impeachment by any and all felony convictions." *Waller*, 118 S.W.3d at 371 (quoting *State v. Walker*, 29 S.W.3d 885, 890

(Tenn. Crim. App. 1999)).  The trial court must make a determination of whether the probative value of the prior conviction outweighs its prejudicial effect.  Tenn. R. Evid. 609(a)(3).  "[C]ourts must focus particular attention on: (1) the relevance of the impeaching conviction to the issue of credibility; and (2) the similarity between the charged offense and the impeaching conviction." *State v. Frederick Herron*, --- S.W.3d ---, No. W2012-01195-SC-R11-CD, 2015 WL 1361262, at *12 (Tenn. Mar. 26, 2015).

In this case, the State notified appellant Carter prior to trial of its intent to use three of his prior convictions for impeachment purposes at trial: a 2002 conviction for facilitation of second degree murder; a 2002 conviction for facilitation of aggravated robbery; and a 2005 conviction for sale of less than .5 grams of a Schedule II controlled substance.  Appellant Carter requested a jury-out hearing to consider the admissibility of the prior convictions, which the trial court held following the close of the State's case-in-chief.  The trial court subsequently determined that the State would not be allowed to introduce evidence of the charges for facilitation of second degree murder and facilitation of aggravated robery because they were substantially similar to the violent charges for which appellant Carter was on trial and, thus, that the probative value was outweighed by the prejudicial effect.  However, the trial court further determined that the State would be allowed to use appellant's prior drug conviction for impeachment purposes, stating:

[W]here there's an actual sale, I think the credibility issue is much greater than for example possession to [sell], and in light of the fact that there are a number of criminal offenses, I think that, although the jury is not going to know about it, in terms of admissib[ility], I think is [sic] a greater justification for allowing that one in.

In addition, the trial court stated that should appellant Carter choose to testify, it would give a limiting instruction to the jury that it should consider the prior conviction only for its impact on appellant Carter's credibility.

On appeal, appellant Carter argues that the trial court's ruling was in error because drug convictions are only minimally probative of credibility, citing to our supreme court's opinion in *Waller*, 118 S.W.3d at 373 (concluding that "prior felony drug convictions are, at best, only slightly probative of [a defendant's] credibility"). However, in the *Waller* case, the supreme court further ruled that the defendant's felony drug convictions were substantially similar to the convictions for which he was on trial and thus that the probative value was outweighed by the prejudicial effect. *Id.* Substantial similarity is not an issue in this case because the trial court disallowed the admission of appellant Carter's violent felony convictions, and no other argument has been adduced to add weight to the prejudicial effect of the admission of the prior conviction for the sale of drugs. While the trial court could have been more articulate in its ruling, it is clear that

the trial court determined that the probative value of the prior conviction outweighed its prejudicial effect. We conclude that the trial court did not abuse its discretion.

### B. Appellant Carter — Sufficiency of the Evidence[7]

Appellant Carter argues that the evidence was insufficient to support his convictions for felony murder, voluntary manslaughter, and attempted especially aggravated robbery. His argument hinges completely on the credibility of the witnesses. The State responds that the evidence was sufficient. We agree with the State.

In this case, to uphold appellant's convictions, the State had to show beyond a reasonable doubt that appellants killed the victim "in the perpetration of or attempt to perpetrate . . . robbery," as charged in the indictment. Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery, the underlying felony, is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." *Id.* § 39-13-401, -403. The jury was instructed that attempt meant that appellant

---

[7] For the applicable standard of review, see Section II.

intended to commit the specific offense of Especially Aggravated Robbery; and . . . that he did some act intending to complete a course of action or cause a result that would constitute Especially Aggravated Robbery under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of Especially Aggravated Robbery.

*See* Tenn. Code Ann. § 39-12-101(a)(3). Appellant was also convicted of voluntary manslaughter as a lesser-included offense of first degree premeditated murder. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. § 39-13-211(a).

Viewed in the light most favorable to the State, the evidence at trial showed that appellant Carter approached the victim, that the two men "scuffled," that appellant Carter shot the victim, and that at his death, the victim did not have the money that he had earlier in the evening. Appellant Carter was identified as the shooter by Jay Artis and by his accomplice, Pamela Jenkins. Appellant Carter correctly notes that the witnesses' testimonies diverged about the clothing worn by the shooter and where the shooter went after the shooting. He also contends that the jury should have disregarded Ms. Jenkins' testimony entirely for lack of credibility. However, in a jury trial, questions involving the

credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). The jury in this case resolved the factual disputes in favor of the State, and we conclude that the evidence was sufficient to support appellant Carter's convictions.

### C. Appellant McLemore — Sufficiency of the Evidence

Appellant McLemore also challenges the sufficiency of the evidence supporting his convictions for facilitation of especially aggravated robbery and facilitation of felony murder. Specifically, he contends that the State's evidence was inadequate to corroborate Ms. Jenkins' testimony. The State responds that the evidence was sufficient to uphold appellant McLemore's convictions. We agree with the State.

Appellant McLemore was convicted of facilitating both especially aggravated robbery and felony murder, which were defined in the section above. A conviction for facilitation requires that the State prove that a defendant "knowingly furnishe[d] substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403. In addition, there is no question that Ms. Jenkins was an accomplice to these offenses, and "a conviction may not be based solely upon the uncorroborated testimony of an

accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). Our supreme court has explained:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged*. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

*Bane*, 57 S.W.3d at 419 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Viewed in the light most favorable to the State, the evidence adduced at trial showed that appellant McLemore engaged in several telephone conversations with appellant Carter leading up to the commission of the offenses, that he was either standing behind appellant Carter or fighting with Mr. Artis during the commission of the offenses, that he left the scene of the crime with appellant Carter, and that he participated in a

conversation after the offenses between appellant Carter and Ms. Jenkins, their accomplice, in which appellant Carter threatened Ms. Jenkins if she told the truth about the shooting. Ms. Jenkins identified the man with appellant Carter that night as "Boxhead Shawn," and the police verified that appellant McLemore used that nickname. Mr. Artis identified appellant McLemore's photograph as the person he had seen with appellant Carter. It was a matter for the jury to determine whether Mr. Artis's assertion that he was eighty percent sure of his identification coupled with the telephone records were sufficient to corroborate Ms. Jenkins' testimony. *See State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997).

Appellant McLemore cites *Mathis v. State*, 590 S.W.2d 449, 454 (Tenn. 1979), for the proposition that evidence of a defendant's presence at the time of the offense is insufficient to corroborate an accomplice's testimony. In that case, multiple witnesses testified that Mathis was in the area while his alleged accomplice, Kimmons, was fighting with the victim, but only Kimmons placed Mathis with him when Kimmons shot the victim. *Id.* The supreme court concluded that this evidence was insufficient corroboration of Kimmons' testimony. *Id.* In this case, Ms. Jenkins was not the only person to testify that appellant McLemore was present. Mr. Artis placed appellant McLemore immediately behind appellant Carter during the shooting. Thus, we conclude that appellant McLemore was fairly and legitimately connected to the offense and that the evidence was sufficient to sustain his convictions.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE